**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM, Individually And On Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:20-cv-02031 |
| vs. | ) ) ) | |
| WORLD WRESTLING ENTERTAINMENT, INC., VINCENT K. McMAHON, GEORGE A. BARRIOS and MICHELLE D. WILSON, | ) ) ) ) | |
| Defendants. | ) | |
| PAUL SZANIAWSKI, Individually And On Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:20-cv-02223 |
| vs. | ) ) ) | |
| WORLD WRESTLING ENTERTAINMENT, INC., VINCENT K. McMAHON, GEORGE A. BARRIOS and MICHELLE D. WILSON, | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF ISAAC MILLAR TO CONSOLIDATE RELATED ACTIONS TO BE APPOINTED LEAD PLAINTIFF AND TO APPROVE PROPOSED LEAD PLAINTIFF'S CHOICE OF COUNSEL**

## <u>TABLE OF CONTENTS</u>

**Page:**

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ................................................................................... 2

PROCEDURAL BACKGROUND ........................................................................... 6

ARGUMENT ........................................................................................................... 6

   I.   THE COURT SHOULD CONSOLIDATE THE RELATED ACTIONS .......................... 6

   II.  MR. MILLAR IS THE PRESUMPTIVE "MOST ADEQUATE PLAINTIFF"
       AND THE COURT SHOULD APPOINT HIM LEAD PLAINTIFF ............................... 7

      A.  Mr. Millar Filed a Timely and Procedurally Complete Motion
          for Lead Plaintiff ................................................................................. 12

      B.  Mr. Millar Has the Largest Known Financial Interest in
          the Relief Sought ................................................................................. 13

      C.  Mr. Millar "Otherwise Satisfies" the *Prima Facie* Requirements
          of Rule 23 ........................................................................................... 13

          1.  Mr. Millar's Claims Are Typical of the Claims of All the
              Class Members ........................................................................... 14

          2.  Mr. Millar Will Adequately Represent the Class ................................. 15

   III. THE COURT SHOULD APPROVE MR. MILLAR'S CHOICE OF
       LEAD COUNSEL ......................................................................................... 15

CONCLUSION ...................................................................................................... 17

# <u>TABLE OF AUTHORITIES</u>

**Page(s):**

**Cases**

*Daniels v. City of N.Y.*,
198 F.R.D. 409 (S.D.N.Y. 2001) ........................................................................................ 14

*Ferrari v. Impath*,
No. 03-cv-5667, 2004 U.S. Dist. LEXIS 13898 (S.D.N.Y. July 15, 2004) ......................... 14

*In re Aol Time Warner Sec. & "ERISA" Litig.*,
MDL No. 1500, 2003 U.S. Dist. LEXIS 145 (S.D.N.Y. Jan. 8, 2003) .................................. 9

*In re Cavanaugh*,
306 F.3d 726 (9th Cir. 2002) ................................................................................. 8, 9, 10, 11

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001) ...................................................................................... 8, 10, 11

*In re Heritage Bond Litig.*,
MDL No. 02-1475, 2004 U.S. Dist. LEXIS 15386 (C.D. Cal. July 12, 2004) ...................... 14

*In re Lucent Techs. Sec. Litig.*,
194 F.R.D. 137 (D.N.J. 2000) ............................................................................................ 16

*In re Nortel Networks Corp.*,
No. 01-cv-1855, 2002 U.S. Dist. LEXIS 1633 (S.D.N.Y. Feb. 4, 2002) .............................. 16

*In re Olsten Corp. Sec. Litig.*,
3 F. Supp. 2d 286 (E.D.N.Y. 1998) ...................................................................................... 7

*In re Oxford Health Plans, Inc., Sec. Litig.*,
182 F.R.D. 42 (S.D.N.Y. 1998) ............................................................................................ 9

*In re Party City Sec. Litig.*,
189 F.R.D. 91 (D.N.J. 1999) .............................................................................................. 10

*In re Star Gas Sec. Litig.*,
No. 04-cv-1766, 2005 U.S. Dist. LEXIS 5827 (D. Conn. Apr. 8, 2005) ............................... 9

*Johnson v. Celotex Corp.*,
899 F.2d 1281 (2d Cir. 1990) ............................................................................................... 6

*Kuriakose v. Fed. Home Loan Mortg. Co.*,
No. 08-cv-7281, 2008 U.S. Dist. LEXIS 95506 (S.D.N.Y. Nov. 24, 2008) .......................... 9

*Kux-Kardos v. VimpelCom, Ltd.*,
151 F. Supp. 3d 471 (S.D.N.Y. 2016) ................................................................................... 6

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co.*,
    229 F.R.D. 395 (S.D.N.Y. 2004) ............................................................................. 9, 11, 12

*Primavera Familienstiftung v. Askin*,
    173 F.R.D. 115 (S.D.N.Y. 1997) ................................................................................ 7

*Rossini v. Ogilvy & Mather, Inc.*,
    798 F.2d 590 (2d Cir. 1986).................................................................................... 14

*Sczesny Trust v. KPMG LLP*,
    223 F.R.D. 319 (S.D.N.Y. 2004) ............................................................................... 9

*Sofran v. Labranche & Co.*,
    220 F.R.D. 398 (S.D.N.Y. 2004) ............................................................................ 8, 9

*Weinberg v. Atlas Air Worldwide Holdings, Inc.*,
    216 F.R.D. 248 (S.D.N.Y. 2003) .............................................................................. 10

*Wilder v. Bernstein*,
    499 F. Supp. 980 (S.D.N.Y. 1980) .......................................................................... 14

*Workman v. Namaste Techs., Inc.*,
    No. 18-cv-10830, 2019 U.S. Dist. LEXIS 10010 (S.D.N.Y. Jan. 18, 2019) .......................... 12

**Statutes**

15 U.S.C. § 78u-4 ..................................................................................................... *passim*

Fed. R. Civ. P. 42.......................................................................................................... 7

Fed.R. Civ. P. 23 .............................................................................................. 2, 14, 15

**Other Authorities**

Conference Report on Securities Litigation Reform, H.R. Rep. No. 369, 104th Congress, 1st
Sess. 31 ....................................................................................................................... 16

Wright & Miller, *Consolidation—Discretion of Court*, 9A FED. PRAC. & PROC. CIV. § 2383
(3d ed.) ......................................................................................................................... 6

## PRELIMINARY STATEMENT

Isaac Millar ("Mr. Millar" or "Movant") respectfully submits this Memorandum of Law in support of his motion to: (1) consolidate the related securities class actions[1] filed against World Wrestling Entertainment, Inc. ("WWE" or the "Company") and certain related Defendants ("Defendants");[2] (2) appoint Movant as Lead Plaintiff in this securities class action pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4(a)(3)(B), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"); and (3) approve Movant's selection of the law firm of Kahn Swick & Foti, LLC ("KSF") as Lead Counsel for the Class.

Movant fully understands his duties and responsibilities to the Class. He is willing and able to oversee the vigorous prosecution of this Action. As described in the Certification and Loss Chart attached to the Declaration of Kim E. Miller in Support of Mr. Millar's Motion to Consolidate Related Actions, to Be Appointed Lead Plaintiff, and to Approve Proposed Lead Plaintiff's Selection of Counsel ("Miller Decl."), Movant has suffered substantial losses as a result of his purchases of WWE securities between February 7, 2019 to February 5, 2020,[3] inclusive (the "Class Period"). *See* Miller Decl. at Exhibit A (Millar Certification) and Exhibit B (Millar Loss Chart). To the best of his knowledge, Movant has sustained the largest losses of any investor(s) seeking to be appointed Lead Plaintiff.

---

[1] The related securities class actions include *City of Warren Police and Fire Ret. Sys. v. World Wrestling Entertainment, Inc., et al.*, No. 20-cv-02031 (S.D.N.Y.), filed on March 6, 2020 (the "*Warren* Action"), and *Szaniawski v. World Wrestling Entertainment, Inc., et al.*, No. 20-cv-02223 (S.D.N.Y.), filed on March 12, 2020 (the "*Szaniawski* Action").

[2] Both the *Warren* Action and the *Szaniawski* Action name the same Defendants: World Wrestling Entertainment, Inc., Vincent K. McMahon, George a. Barrios, and Michelle D. Wilson.

[3] Both the *Warren* Action and the *Szaniawski* Action allege the same Class Period of February 7, 2019 to February 5, 2020, inclusive.

In addition to evidencing the largest financial interest in the outcome of this litigation, Movant's Certification demonstrates his intent to serve as Lead Plaintiff in this matter, including his cognizance of the duties of serving in that role. *See* Miller Decl. at Ex. A. Moreover, Movant satisfies both the applicable requirements of the PSLRA and Rule 23 of the Federal Rules of Civil Procedure. Accordingly, Movant respectfully submits this memorandum of law in support of his motion for an Order: (1) consolidating the related actions; (2) appointing Movant as Lead Plaintiff in this Action; and (3) approving his selection of the law firm of Kahn Swick & Foti, LLC ("KSF") as Lead Counsel for the Class.

## **FACTUAL BACKGROUND**[4]

WWE was founded in 1980 and is headquartered in Stamford, Connecticut. The Company engages in the sports entertainment business in North America, Europe, the Middle East, Africa, the Asia Pacific, and Latin America. ¶2. WWE Class A common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "WWE." ¶18. Defendant Vincent K. McMahon ("McMahon") has served at all relevant times as the Chief Executive Officer ("CEO") of WWE and Chairman of WWE's Board of Directors. ¶19. Defendant George A. Barrios ("Barrios") was a Co-President of WWE, its principle financial officer and a member of its Board of Directors during the Class Period. On January 30, 2020, WWE announced that Barrios had abruptly left the Company "effective immediately." ¶20. Defendant Michelle D. Wilson ("Wilson") was a Co-President of WWE and a member of its Board of Directors during the Class Period. On January 30, 2020, WWE announced that Wilson had abruptly left the Company "effective immediately." ¶21.

---

[4] These facts are derived from the complaint filed in the *Szaniawski* Action (the "*Szaniawski* Complaint"). All "¶__" and "¶¶__" references are to the *Szaniawski* Complaint.

The Kingdom of Saudi Arabia is a country in Western Asia constituting the bulk of the Arabian Peninsula. The state is an absolute monarchy ruled by the Al Saud royal family. Beginning in 2014, the Saudi government began hosting several WWE live events in Saudi Arabia. The events were very lucrative for WWE, and later expanded as part of Saudi Arabia's social and economic reform program, Saudi Vision 2030. ¶27. OSN is a direct-broadcast satellite provider serving the MENA region. OSN has traditionally offered popular entertainment content such as movies, sporting events, and various TV shows from major U.S. and international networks and studios, in addition to local versions specifically for the MENA region. The OSN network is owned and operated by Panther Media Group Limited, a joint venture between a Kuwait-based company and Mawarid Holding, a private Saudi investment company controlled by the Al Saud royal Saudi family. ¶28. In March 2018, the Saudi Press Agency announced that WWE and the Saudi General Sports Authority had signed a 10-year multi-platform partnership with WWE to hold wrestling events in the country. Analysts estimated the partnership was worth about $500 million to WWE. ¶32. On October 2, 2018, the world was shocked to learn of the murder of journalist Jamal Khashoggi, in which the Saudi government was implicated. The incident placed added strain on the relationship between WWE and the Saudi government, which had begun to break down by at least the start of 2019. ¶36.

On February 7, 2019, the first day of the Class Period, WWE issued a press release announcing its fourth quarter and fiscal 2018 ("4Q18" and "FY18") financial results for the period ended December 31, 2018 and providing fiscal year 2019 ("FY19") financial guidance. ¶37. That same day, WWE also filed its FY18 Annual Report on Form 10-K with the SEC ("FY18 10-K"), which emphasized the continuing importance of the Company's Saudi business dealings and WWE's relationship with Saudi Arabia, stating that "[i]n 2018, WWE embarked on an important

long-term partnership with the General Sports Authority of the Kingdom of Saudi Arabia for, among other things, a series of live events in that region." It also stated that WWE had "an important partnership with the General Sports Authority of the Kingdom of Saudi Arabia" that was then "expected to continue to constitute a significant percentage of [WWE's] revenues." ¶¶41-42.

The statements, among others alleged in the *Szaniawski* Complaint, were materially false and misleading when made because Defendants failed to disclose that: (i) WWE was experiencing rising tension with the Saudi government and a breakdown in negotiations over a renewed broadcasting distribution deal; (ii) the Saudi government and its affiliates had failed to make millions of dollars in payments owed to WWE pursuant to existing contractual commitments between the parties; (iii) OSN had terminated the broadcast of WWE programming in the first quarter of 2019 despite a contractual obligation to continue such broadcasts, which cancellation was symptomatic of a deterioration in the business relationship between the parties; (iv) OSN had rebuffed efforts to renew a distribution rights agreement on terms acceptable to WWE, and such renewal was unlikely to occur in 2019, if ever; (v) WWE did not have the ability to expand its operations in the Middle East or within Saudi Arabia as had been represented to investors; and (vi) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times. ¶45.

On April 25, 2019, WWE reported disappointing first quarter 2019 ("1Q19") financial results, revealing that revenues had fallen year over year on notable declines in the live events and consumer products segments. In addition, WWE announced lower than expected guidance for its second quarter of 2019 ("2Q19"), but maintained full-year guidance of "at least $200 million" in adjusted OIBDA. The Company also revealed a $24 million uptick in accounts receivables, but

4

claimed that this reflected the ordinary timing of different events. WWE blamed the absence of certain "Super Stars" for the poor performance, but several analysts tied the disappointing results and guidance to potential delays in scheduling a live Saudi event. ¶46. On this news, WWE's stock price fell $13.12 per share, or 13.12%, to close at $85.38 per share on April 25, 2019, on unusually high volume of more than 10 million shares traded. ¶47. On October 31, 2019, WWE issued a press release providing the Company's third quarter 2019 ("3Q19") financial results. The press release stated that the Company's revenues and operating income had continued to decline year over year to $186.3 million and $6.4 million, respectively. The Company also announced that it was lowering its FY19 adjusted OIBDA guidance to a range of $180 million to $190 million due in large part to WWE's failure to complete a MENA distribution agreement with the Saudis.¶56. On this news, WWE's stock price fell $10.40 per share, or 15.65%, to close at $56.04 per share on October 31, 2019, on unusually high volume of more than 7.5 million shares traded.¶60. On January 30, 2020, WWE announced that two of its most senior and longest serving executives, Defendants Barrios and Wilson, had abruptly left the Company. Analysts and market commentators reacted with shock at the sudden loss of two key figures who had long been part of the public face of the Company. For example, *Forbes* described the departures as a "bloodbath" that had caused "[p]anic and uncertainty" throughout WWE's corporate offices. ¶61. On this news, WWE's stock price fell $13.42 per share, or 21.54%, to close at $48.88 per share on January 31, 2020, on unusually high volume of more than 19.4 million shares traded. ¶62.

Finally, on February 6, 2020, WWE again announced disappointing financial results and guidance. The earnings release issued by the Company revealed that consumer engagement metrics had continued to deteriorate in the fourth quarter, and that the Company had achieved just $180 million in adjusted OBIDA for the year due to the failure to complete the MENA distribution

agreement with the Saudis. On an earnings call to discuss the results, WWE's CFO, Frank Riddick, confirmed that the Company's 2020 financial guidance did not include any revenues related to a prospective MENA deal. ¶63. On this news, WWE's stock price fell another $4.50 per share, or 9.18%, to close at $44.50 per share on February 6, 2020, on unusually high volume of more than 15.5 million shares traded. ¶64.

## PROCEDURAL BACKGROUND

The first lawsuit against WWE was filed in the Southern District of New York on March 6, 2020. *See City of Warren Police and Fire Ret. Sys. v. World Wrestling Entertainment, Inc., et al.*, No. 20-cv-02031 (S.D.N.Y.). Thereafter, on March 12, 2020, plaintiff Paul Szaniawski filed a second federal securities fraud class action alleging the same claims against the same Defendants, for the same Class Period, also in the Southern District of New York. *See Szaniawski v. World Wrestling Entertainment, Inc., et al.*, No. 20-cv-02223 (S.D.N.Y.). While the *Warren* Action asserts claims "on behalf of all purchasers of WWE Class A common stock," (*Warren* Complaint at ¶1), the *Szaniawski* Action asserts claims "on behalf of…all persons…who purchased or otherwise acquired WWE securities…." *Szaniawski* Complaint at ¶1.

## ARGUMENT

### I.    THE COURT SHOULD CONSOLIDATE THE RELATED ACTIONS

Pursuant to the PSLRA, "[i]f more than one action on behalf of a class asserting substantially the same claim or claims arising under this title has been filed," courts shall not appoint a lead plaintiff until "after the decision on the motion to consolidate is rendered." 15 U.S.C. § 78u-4(a)(3)(B)(ii). Pursuant to Rule 42(a), "[t]he Court enjoys 'broad discretion to determine whether consolidation is appropriate.'" *Kux-Kardos v. VimpelCom, Ltd.*, 151 F. Supp. 3d 471, 475 (S.D.N.Y. 2016) (quoting *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284 (2d Cir. 1990)); Wright & Miller, *Consolidation—Discretion of Court*, 9A FED. PRAC. & PROC. CIV. § 2383 (3d ed.)

("[D]istrict court is given broad discretion to decide whether consolidation under Rule 42(a) would be desirable and the district judge's decision inevitably is highly contextual.").

Courts have recognized that securities class actions are ideally suited for consolidation pursuant to Fed. R. Civ. P. 42(a) because their unification expedites pretrial proceedings, reduces case duplication, avoids contacting of the parties and witnesses for inquiries in multiple proceedings, and minimizes the expenditure of time and money by all persons concerned. *See Primavera Familienstiftung v. Askin*, 173 F.R.D. 115, 129 (S.D.N.Y. 1997). Consolidating shareholder class actions streamlines and simplifies pre-trial and discovery proceedings, including motions, class action issues, clerical and administrative duties, and generally reduces the confusion and delay that result from prosecuting related actions separately before two or more judges. *Id.*; *see also In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286 (E.D.N.Y. 1998) (same).

The *Warren* Action and *Szaniawski* Action, both pending before the United States District Court for the Southern District of New York, make substantially similar allegations on behalf of a similar class of shareholders. In light of these legal principles and the numerous commonalities shared by the actions, consolidation is appropriate under Rule 42(a).

## II.    MR. MILLAR IS THE PRESUMPTIVE "MOST ADEQUATE PLAINTIFF" AND THE COURT SHOULD APPOINT HIM LEAD PLAINTIFF

The PSLRA governs the appointment of a lead plaintiff for "each private action arising under [the Securities Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B) (setting forth identical provisions with respect to claims brought under the Exchange Act). It provides that, within 20 days of the filing of the action, the plaintiff is required to publish notice in a widely circulated business- oriented publication or wire service, informing class members of their right to move the Court, within sixty (60) days of

the publication, for appointment as lead plaintiff. *See* 15 U.S.C. § 78u-4(a)(3)(A)(i); s*ee generally Sofran v. Labranche & Co.*, 220 F.R.D. 398, 401 (S.D.N.Y. 2004).

Under 15 U.S.C. § 78u-4(a)(3)(B)(i), the Court must then consider any motion made by class members and appoint as lead plaintiff that movant the Court determines to be most capable of adequately representing the interests of class members. *See generally Sofran*, 220 F.R.D. at 401. Further, the PSLRA establishes a rebuttable presumption that the "most adequate plaintiff" is the person that:

> (aa)   has either filed the complaint or made a motion in response to a notice [published by a complainant];
>
> (bb)   in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc)   otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

Once it is determined who among the movants seeking appointment as lead plaintiff is the presumptive lead plaintiff, the presumption can be rebutted only upon proof by a class member that the presumptive lead plaintiff: "(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

Two leading Circuit Courts have directly addressed the procedural standards applicable to the PSLRA lead plaintiff process – the Ninth Circuit, in *Herrgott v. U.S. Dist. Court for the N. Dist. of Cal. (In re Cavanaugh)*, 306 F.3d 726, 729-31 (9th Cir. 2002), and the Third Circuit, in *In re Cendant Corp. Litig.*, 264 F.3d 201, 262-68 (3d Cir. 2001). District courts within this Circuit

routinely rely on both of these cases for guidance.[5] After extensive analyses, both courts concluded the PSLRA's statutory framework sets out a mandatory, strict, and sequential three-step process:

First, the court must confirm that proper notice has been disseminated pursuant to the PSLRA. *See Cavanaugh*, 306 F.3d 726, 729-31; *accord* 15 U.S.C. §§ 78u-4(a)(3)(A)(i); *Sofran*, 220 F.R.D. at 401.

Second, to identify the "most adequate plaintiff," the PSLRA provides that "the court shall adopt a presumption that the most adequate plaintiff…is the person or group of persons that…has the largest financial interest in the relief sought by the class…and otherwise satisfies the requirements of Rule 23." 15 U.S.C. §78u-4(a)(3)(B)(iii)(I). During this step, the court must "compare the financial stakes of the various plaintiffs and determine which one has the most to gain from the lawsuit." *Cavanaugh*, 306 F.3d at 729-30. The court "must then focus its attention on *that* plaintiff and determine, *based on the information he has provided in his pleadings and declarations*, whether he satisfies the requirements of Rule 23(a), in particular those of 'typicality' and 'adequacy.'" *Id.* at 730.[6]

Third, the court may then "give other plaintiffs an opportunity to rebut the presumptive lead plaintiff's showing that it satisfies Rule 23's typicality and adequacy requirements." *Id.* at

---

[5] *See, e.g.*, *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 536 (S.D.N.Y. 2015) (citing *Cavanaugh* and *Cendant*); *Kuriakose v. Fed. Home Loan Mortg. Co.*, No. 08-cv-7281, 2008 U.S. Dist. LEXIS 95506 (S.D.N.Y. Nov. 24, 2008) (citing *Cavanaugh* and *Cendant*); *In re Star Gas Sec. Litig.*, No. 04-cv-1766, 2005 U.S. Dist. LEXIS 5827 (D. Conn. Apr. 8, 2005) (citing *Cavanaugh* and *Cendant*); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co.*, 229 F.R.D. 395 (S.D.N.Y. 2004) (citing *Cendant*); *Sofran*, 220 F.R.D. at 402 (citing *Cavanaugh*); *In re Aol Time Warner Sec. & "ERISA" Litig.*, MDL No. 1500, 2003 U.S. Dist. LEXIS 145 (S.D.N.Y. Jan. 8, 2003) (citing *Cavanaugh*).

[6] In connection with lead plaintiff appointments, courts have consistently held that the Rule 23 considerations are limited to an evaluation of typicality and adequacy. *See In re Oxford Health Plans, Inc., Sec. Litig.*, 182 F.R.D. 42, 49 (S.D.N.Y. 1998) (typicality and adequacy are the only relevant prerequisites to lead plaintiff selection); *Sczesny Trust v. KPMG LLP*, 223 F.R.D. 319, 323-24 (S.D.N.Y. 2004) (same).

730; *accord Cendant*, 264 F.3d at 262 ("[T]he court first identifies the presumptive lead plaintiff, and then determines whether any member of the putative class has rebutted the presumption."). Importantly, the PSLRA's presumption may be rebutted "only upon *proof*" that the presumptively most adequate plaintiff "will not fairly and adequately protect the interests of the class; or…is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. §78u-4(a)(3)(B)(iii)(II) (emphasis added).

Only if, as a result of this three-step process, the presumptive lead plaintiff does not meet the typicality or adequacy requirements of Rule 23, can the court then proceed to analyze the plaintiff with the next lower stake. *See Cavanaugh*, 306 F.3d at 729-730. Importantly, though, in coming to this conclusion, the *Cavanaugh* and *Cendant* courts outlined three critical guidelines:

First, to be afforded the presumption in step two, a movant need only make a *prima facie* showing that it is otherwise typical and adequate – a lower showing than the *proof* required of competing movants in the adversarial step three. *See Cendant*, 264 F.3d at 264 ("[T]he court's initial inquiry as to whether the movant with the largest losses satisfies the typicality and adequacy requirements *need not be extensive*." Rather, "the court's initial inquiry should be confined to determining whether such movants have stated a *prima facie case* of typicality and adequacy.").[7]

Second, the court's *prima facie* determinations of typicality and adequacy must be "based on the information [the movant] has provided *in his pleadings and declarations*," and rebuttal evidence introduced by competing movants should specifically not be considered  during this

---

[7] *Accord Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 252 (S.D.N.Y. 2003) ("In fact, a 'wide ranging analysis under Rule 23 is not appropriate [at this initial stage of the litigation] and should be left for consideration of a motion for class certification.'") (quoting *In re Party City Sec. Litig.*, 189 F.R.D. 91, 106 (D.N.J. 1999)).

second step presumption analysis. *Cavanaugh*, 306 F.3d at 730.[8] "At step two of the process, when the district court makes its initial determination, it must rely on the presumptive lead plaintiff's *complaint and sworn certification; there is no adversary process to test the substance of those claims.*" *Id.* Rather, it is "[a]t the third stage [that] the process turns adversarial and other plaintiffs may present evidence that disputes the lead plaintiff's prima facie showing of typicality and adequacy." *Id.*[9]

<u>Finally</u>, the lead plaintiff determination does not depend on the court's judgment of which party will be the best lead plaintiff for the class, but rather which movant fulfills the statutory requirements. "[T]he statutory scheme…provides no occasion for comparing plaintiffs with each other on any basis other than their financial stake in the case….That the district court believes another plaintiff may be 'more typical' or 'more adequate' is of no consequence….[H]e is entitled to lead plaintiff status, even if the district court is convinced that some other plaintiff would do a better job." *Cavanaugh*, 306 F.3d at 732.[10]

Applying these governing standards, Mr. Millar is the presumptive "most adequate

---

[8] *Accord Cendant,* 264 F.3d at 264 ("In conducting the initial [presumption] inquiry…the court may and should consider the pleadings that have been filed, the movant's application, and any other information that the court requires to be submitted.").

[9] *Accord Cendant,* 264 F.3d at 263-64 (The "threshold determination" of typicality and adequacy "should be a product of the court's independent judgment, and [] arguments by members of the purported plaintiff class as to why it does not should be considered only in the context of assessing whether the presumption has been rebutted."); *Pirelli*, 229 F.R.D. at 414-15 (finding no "support [for] the notion that courts have required movants 'to provide adequate information about themselves' in addition to and apart from the PSLRA's own requirements….").

[10] *Accord Cendant*, 264 F.3d at 268 ("[T]he question is not whether another movant might do a better job of protecting the interests of the class than the presumptive lead plaintiff….[T]he inquiry is not a relative one."); *Khunt*, 102 F.Supp. 3d at 535-36 ("[A] district court's belief that 'another plaintiff may be more typical or more adequate is of no consequence. So long as the plaintiff with the largest losses satisfies the typicality and adequacy requirements, he is entitled to lead plaintiff status, even if the district court is convinced that some other plaintiff would do a better job.'") (citing *Cavanaugh*, 306 F.3d at 732).

plaintiff[s]" – and thus his motion should be granted and all other competing motions denied – because he: (i) filed a timely and procedurally complete motion for appointment as lead plaintiff in response to a notice that satisfies the PSLRA's statutory requirements; (ii) has the largest known financial interest in the relief sought; and (iii) "otherwise satisfies" the minimal, *prima facie* requirements of Rule 23.

### A.    Mr. Millar Filed a Timely and Procedurally Complete Motion for Lead Plaintiff

Under the PSLRA, the first plaintiff to file an action must publish notice advising members of the putative plaintiff class of the pending action in a widely circulated national business-oriented publication or wire service and members of the putative class have sixty days from the date of publication to move the court to serve as lead plaintiff. *See* 15 U.S.C. § 78u- 4(a)(3)(A)-(B). Here, notice of the *Warren* Action was first published in *Business Wire*[11] on March 6, 2020, so the deadline for submission of applications to be appointed Lead Plaintiff is May 5, 2020. *See* Miller Decl. at Exhibit C (Statutory Notice); Fed. R. Civ. P. 6. Mr. Millar has therefore timely filed his motion.

Moreover, with that motion, Mr. Millar has signed and submitted the required Certification in which he certified his trading history during the Class Period and confirmed his willingness and ability to serve as Lead Plaintiff, thereby satisfying the certification requirement set forth in 15 U.S.C. § 78u-4(a)(2)(A). *See* Miller Decl. at Ex. A and Ex. B. Accordingly, Mr. Millar has filed a

---

[11] Publication by a national press release firm like *Business Wire* is an adequate means for meeting the PSLRA statutory requirement that notice be published in a widely circulated national business-oriented wire service. *See, e.g.*, *Workman v. Namaste Techs., Inc.*, No. 18-cv-10830, 2019 U.S. Dist. LEXIS 10010, at *3 (S.D.N.Y. Jan. 18, 2019) ("Business Wire "is a suitable vehicle for meeting the statutory requirement that notice be published."") (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co.*, 229 F.R.D. 395, 403 (S.D.N.Y. 2004)).

timely and procedurally complete motion for appointment as Lead Plaintiff in response to a notice that satisfies the statutory requirements.

> **B.    Mr. Millar Has the Largest Known Financial Interest in the Relief Sought**

During the Class Period, as evidenced by the accompanying signed Certification, Mr. Millar purchased WWE securities in reliance upon the materially false and misleading statements and omissions issued by Defendants and were injured thereby. *See* Miller Decl. at Ex. A. In addition, Mr. Millar incurred a substantial loss on his transactions in WWE securities. *See* Miller Decl. at Ex. B. To the best of his knowledge, Mr. Millar thus possesses the largest financial interest in the relief sought. Therefore, Mr. Millar satisfies all of the PSLRA's prerequisites for appointment as Lead Plaintiff in this action and should be appointed Lead Plaintiffs pursuant to 15 U.S.C. § 78u-4(a)(3)(B).

> **C.    Mr. Millar "Otherwise Satisfies" the *Prima Facie* Requirements of Rule 23**

In addition to possessing the largest financial interest in the outcome of the litigation, a lead plaintiff must also "otherwise satisf[y] the requirements of Rule 23." 1 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). As outlined above, to be afforded the presumption in step two, a movant need only make a *prima facie* showing that it is otherwise typical and adequate. That *prima facie* determination should be based on the information the movant has provided in his pleadings and declarations only, and rebuttal evidence introduced by competing movants should specifically not be considered during this second step analysis. *Supra* §II. Here, Mr. Millar easily satisfies these minimal, *prima facie* requirements.

1.      **Mr. Millar's Claims Are Typical of the Claims of All the Class Members**

Under Rule 23(a)(3), typicality exists where "the claims…of the representative parties" are "typical of the claims…of the class." The typicality requirement of Rule 23(a)(3) is satisfied when the representative plaintiffs' claims arise from the same event or course of conduct that gives rise to claims of other class members, and when the claims are based on the same legal theory. *See Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 598 (2d Cir. 1986). The requirement that the proposed class representatives' claims be typical of the claims of the class does not mean, however, that the claims must be identical. *See Daniels v. City of N.Y.*, 198 F.R.D. 409, 418 (S.D.N.Y. 2001) (citing *Wilder v. Bernstein*, 499 F. Supp. 980, 922 (S.D.N.Y. 1980)); *see also Ferrari v. Impath*, No. 03-cv-5667, 2004 U.S. Dist. LEXIS 13898, at *18 (S.D.N.Y. July 15, 2004) (same); *In re Heritage Bond Litig.*, MDL No. 02-1475, 2004 U.S. Dist. LEXIS 15386, at *25 (C.D. Cal. July 12, 2004) ("Courts have held that if the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of the factual differences.").

In this case, the typicality requirement is met because Mr. Millar's claims are identical, non-competing, and non-conflicting with the claims of the other Class members. Mr. Millar and all the other Class Members: (1) purchased WWE securities during the Class Period; (2) purchased WWE securities in reliance upon the allegedly materially false and misleading statements issued by Defendants; and (3) suffered damages by purchasing artificially inflated securities and then suffered harm when the truth was revealed and the inflation was removed from the share price. Thus, Mr. Millar's claims are typical of those of other Class members since his claims and the claims of other Class members resulted from the same illegal practices.

## 2.    Mr. Millar Will Adequately Represent the Class

Under Rule 23(a)(4), the representative parties must also "fairly and adequately protect the interests of the class." The PSLRA directs this Court to limit its inquiry regarding the adequacy of the movants to the existence of any conflicts between the interests of the movants, on the one hand, and the members of the Class, on the other hand. The standard for adequacy of representation under Rule 23(a)(4) is met by: (1) the absence of potential conflicts between the named plaintiff and the other class members; and (2) if the proposed class representative's choice of counsel can prosecute vigorously on behalf of the class. *See* 15 U.S.C. § 78u-4(a)(3)(B).

Here, Mr. Millar, a Certified Public Accountant employed as a Senior Manager in the Assurance department of Ernst & Young LLP, is an adequate representative of the Class. As evidenced by the injuries suffered by Mr. Millar, which purchased WWE securities at prices that were artificially inflated by Defendants' materially false and misleading statements and was harmed when the truth was revealed and the artificial inflation was removed from the price of those securities, his interests are clearly aligned with the members of the Class, and there is no evidence of any antagonism between Mr. Millar's interests and those of the other members of the Class. Furthermore, Mr. Millar has retained competent and experienced counsel to prosecute these claims. Mr. Millar's proposed Lead Counsel is highly qualified, experienced, and able to conduct this complex litigation in a professional manner. Thus, Mr. Millar *prima facie* satisfies the commonality, typicality, and adequacy requirements of Rule 23 for the purposes of this motion.

## III.    THE COURT SHOULD APPROVE MR. MILLAR'S CHOICE OF LEAD COUNSEL

Pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(v), the proposed lead plaintiffs shall, subject to court approval, select and retain counsel to represent the class they seek to represent. Courts have refrained from disturbing lead plaintiffs' choice of counsel unless it is necessary to "protect the

interests of the class." *In re Lucent Techs. Sec. Litig.*, 194 F.R.D. 137, 155 (D.N.J. 2000) (citing Conference Report on Securities Litigation Reform, H.R. Rep. No. 369, 104th Congress, 1st Sess. 31, *reprinted in* 1995 U.S.C.C.A.N. 679, 685); *see also In re Nortel Networks Corp.*, No. 01-cv-1855, 2002 U.S. Dist. LEXIS 1633, at *2 (S.D.N.Y. Feb. 4, 2002) (same).

Here, Mr. Millar has selected KSF to be Lead Counsel for the Class. As reflected in its firm resume, KSF is more than qualified to work as Lead Counsel to prosecute the claims of the Class. With lawyers in Louisiana, New York, and California dedicated to the practice of class action and individual investor securities and corporate governance litigation, KSF is one of the nation's premier boutique securities litigation law firms. KSF has represented stockholders as lead or co-lead counsel in numerous class and derivative litigations, many of which have resulted in substantial recoveries on behalf of stockholders, amounting to hundreds of millions of dollars. *See* Miller Decl. at Exhibit D (KSF Firm Resume).

Notably, KSF has achieved numerous litigation successes serving as lead, co-lead, or executive committee counsel in other securities class actions, including others in the Second Circuit. *See Id.* (citing *In Re Health Ins. Innovations*, No. 17-cv-2186 (M.D. Fla.) (denying in part defendants' motion to dismiss securities class action on June 28, 2019); *Shanawaz v. Intellipharmaceutics Int'l Inc., et al.*, No. 17-cv-5761 (S.D.N.Y.) (denying in part defendants' motion to dismiss securities class action on December 17, 2018); *Dougherty v. Esperion Therapeutics, Inc., et al.*, No. 17-cv-1701 (6th Cir.) (reversing and remanding lower court's dismissal of securities class action on September 27, 2018)).

KSF also served as special counsel and court-appointed Co-Counsel to the lead plaintiff in *The Erica P. John Fund, Inc. v. Halliburton Company, et al.*, No. 02-cv-1152 (N.D. Tex.), which settled for $100 million. Prior to settlement, the *Halliburton* case itself had twice been to the Unites

States Supreme Court. In the first instance, plaintiffs won 9-0. In the second instance, the Halliburton defendants challenged the "fraud on the market theory," the fundamental theory on which all class action securities litigation rests. Despite the Halliburton defendants' protestations, the Supreme Court sided with the plaintiffs and upheld that theory. As the aforementioned cases demonstrate, KSF possesses the requisite experience and knowledge litigating complex securities cases.

Thus, the Court may be assured that, in granting this motion, the Class will continue to receive legal representation of the highest caliber.

## **CONCLUSION**

For all of the foregoing reasons, Isaac Millar, respectfully request that this Court: (1) consolidate the related actions; (2) appoint Mr. Millar to serve as Lead Plaintiff in this consolidated action; (3) approve Mr. Millar's selection of KSF as Lead Counsel for the Class; and (4) grant such other and further relief as the Court may deem just and proper.

DATED: May 5, 2020                    Respectfully submitted,

**KAHN SWICK & FOTI, LLC**

*/s/ Kim E. Miller*
Kim E. Miller (KM-6996)
250 Park Avenue, Suite 2040
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

-and-

Lewis S. Kahn
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

*Counsel for Lead Plaintiff Movant Isaac Millar and*
*Proposed Lead Counsel for the Class*

17

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 5, 2020 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all CM/ECF participants. I further certify that I mailed the foregoing document and the notice of electronic filing via U.S. first-class mail to any non-CM/ECF participants.

*/s/ Kim E. Miller*
Kim E. Miller